et al., Messrs. Kass, and O'Meara Good morning, Your Honors. My name is Richard Kass. I'm from the firm of Bonn, Chenick & King. I represent the appellant's defendants, Kevin Hawkins and Transcontinental Ultraflex, Inc. Do you wish to reserve any time for your honor? I wish to reserve three minutes, please. That's fine. Your Honors, it's now been almost five months, and without any evidentiary hearing, Fresco has been enjoying the benefit of a non-competition agreement that the Eastern District of Pennsylvania ruled in 2005, just that the same exact contract was an unenforceable contract. The court here ruled that there was irreparable harm. Now, it didn't get to the other factors, and that's what we can talk about, but what is your argument that there was no irreparable harm with regard to that particular factor? Well, there was no evidentiary hearing whatsoever about any brief affidavits. It was an affidavit by Kevin McRae from Fresco and an affidavit by Mr. Hawkins on behalf of the defendants. There was no way for the judge to determine which of those affidavits was correct, and really, the Hawkins affidavit contradicts just about every material fact in the McRae affidavit. So based on the record that was before the judge determined there was any irreparable harm. Mr. Hawkins really rebutted any implication that there were real trade secrets at risk, because this is an industry where it's not a secret who the customers are. Everybody knows who the customers are. All the players come to conventions several times a year. Is that really the tough issue in this case? Everybody knows who the customers are, but there were also, there was a question of whether he could solicit those customers during that one year period, and there may have been other information that was confidential. Well, you say there may have been other information that was confidential, but there was no evidence in the record before the court at the time that this preliminary injunction was issued that would support that conclusion. I thought Kevin McRae, the director of sales, testified that Hawkins refused to confirm that he would honor the non-compete. Well, there's no doubt. He said that he would not, he was very straightforward. He said, no, I'm not going to be honoring the non-competition agreement. This is a non-competition agreement that Mr. Hawkins knew had been struck down by the Eastern District of Pennsylvania in 2005. How did he know that it had been struck down until after this lawsuit was filed? He knew it shortly before he came to Transcontinental because he was friends with Mr. Bedell, who was the defendant in the other case. He knew that that lawsuit was taking place. What he didn't know is that his contract was just about identical to that contract. That is something that he found out shortly before he came to Transcontinental. But in this case, did he give consideration? Was consideration part of the inquiry? Yes, there was no consideration issue in this case. In the Bedell case, consideration was one of the two grounds for the court's decision. But at the end of the Bedell decision... Why was there no consideration in this particular case? Because Mr. Bedell was continuing his employment. No, no, in this case. Oh, there was consideration in this case. I'm not arguing that there was no consideration in this case. However, in the Bedell case, it's made very clear at the very end of the decision that the court would have reached the same exact decision, even without the consideration problem that was present in the Bedell case. The court says, even if Bedell had received consideration for the 1999 agreement, it would be inequitable to reform that form under these highly oppressive circumstances. So it's very clear that, forgetting about the consideration issue, the Bedell case struck down this agreement on the substantive ground that it was oppressive and overbroad. And those paragraphs, that paragraph 7 that the judge in the Bedell case was talking about there, are identical to the provisions in this case. So I think you have to look at it from Mr. Hawkins' point of view. I mean, Mr. Hawkins has a contract. All that he knows is that a court has struck down that exact contract as being oppressive and overbroad. And now, without any evidentiary hearing about whether there are any trade secrets or anything at all, you know, Fresco has had the benefit of almost half the period of time that it sought to have by this contract that's already been struck down as being oppressive and overbroad. It's had the benefit now of almost five months of that non-competition that this court decided in 2005 Fresco did not deserve to have. So ruling in Fresco's favor here. The point about Bedell and what happened in 2005 with Judge Dalzell, that goes to the merits of Fresco's claims, and that wasn't addressed by the district court. Do we need to address it? You don't need to address it, but I think you should address it. Because, first of all, it is relevant to this appeal because it deals with the issue of the likelihood of success on the merits. And what often happens in these restrictive covenant cases, as I'm sure your honors know, is that the issues in the preliminary injunction stage very much overlap with the final issues in the case. And here, when you look at the likelihood of success on the merits, although the narrow issue in the preliminary injunction context really is what's the likelihood of success, I think it's a very tiny step to go from that and that analysis to say, well, look, there's collateral estoppel here, there's issue preclusion here, there's really no merits to this case, this case should be dismissed. And that's what we ask this court to do. And why shouldn't we remand to have the district court go through all of the four categories? Well, there's an option that, of course, you have. But my position would be that that would really be a useless exercise because it's very clear on this record that it already exists that the doctrine of issue preclusion applies, and that the Dell case really takes care of this. Would that be an argument as to the likelihood of success on the merits? And do you get another shot at that? It could be done that way. It could be remanded. I don't argue that you don't have the power to remand. What I'm saying, though, is that I believe that that could be a waste of the lower court's time, a waste of the party's time because, based on this record, there is no way that FRESCO could escape the conclusion that not only don't they have a likelihood of success on the merits, but that they have no possibility of success on the merits because of the doctrine of issue preclusion. Is the only restraint on Mr. Hawkins soliciting the 12 large customers? Yes. However, that's virtually all of the work that he was doing. And there's no restraint on FRESCO from or no restraint on Transcontinental from soliciting those 12 customers? That's correct. However, two things. First, I don't think FRESCO should be rewarded for an 11-year period of time, after it was unnoticed that its agreement was oppressive and unenforceable, for 11 years keeping those contracts in place, not even attempting to replace them, and enjoying the interim effect that laymen have. They read their contract. They think they're not entitled to do anything. The reason why they were struck down in part is that an employee can't even know what he's restricted from doing because he's restricted from going into any line of business that FRESCO might even be contemplating outside of his knowledge. So to reward FRESCO for that. Mr. Crowley, will you lose me a bit? Okay. The best argument it would appear that you have is that there were four factors to be considered. Yes. The district court, in a footnote to its order, considered essentially only one. Yes. The first one to be considered is likelihood of success on the merits, and you're saying that with regard to that particular matter, your client should win because in that very same court another judge has said that a very similar contract was not enforceable. Correct. So wouldn't you, and we say okay, if we remand, a couple have said that already, and you're saying, yeah, but it would be a waste of the court's time because you perceive, I guess, that you're going to lose. But what else can we do? No, I'm not perceiving that we're going to lose. What I'm perceiving is that on the record of this court right now, it could be concluded in the context of the analysis of likelihood of success on the merits that there is actually no likelihood of success on the merits because of. I have no clue whether the 2005 decision was correct, to what extent it binds Judge Tucker, Chief Judge Tucker. How do I do that here? Well, because of the factors of issue preclusion. You have the identical issue, the identical contract language, the same contracts in all relevant respects, same job title, they're both salespeople, same legal issue. You have a final adjudication on the merits. That's the second factor. Enforcing it's the same party, even the same law firm. You made that argument to the district court, correct? Yes. And the district court didn't deal with it at all? That's correct. So doesn't the district court get the first shot at the apple? It couldn't. And isn't there a question, I mean, Bedell was also decided for the absence of consideration for the new agreement, so anything beyond that may not have been necessary to the district court's decision. Well, except for what I just read from the Bedell decision at the end, the judge does it all made very clear that even if it were not for the consideration issue, he still would have ruled the same way. Yes, but that still makes it dicta. I mean, you have no contract at all when you have a contract that's unenforceable for lack of consideration. That's true. But you have two equal grounds here, so either one of them, when you have two equal grounds, I don't think it's fair to say that both of them are dicta. Well, I think that's subject to question whether they're equal grounds. That is, usually in conclusion, the ruling has to be essential to the judgment. And it seems to me there is an argument that the second ground is not essential to the judgment. I'm not saying it isn't, but you're asking for us to do something that perhaps the district court ought to consider in the first instance. I understand what you're saying. It is a pure question of law, though I do believe this court would have the power to do that, but I understand that the panel probably feels differently about it. So if it can be remanded on that ground, then the court below would have to make that determination. That, of course, ultimately could be subject to appeal by whichever party is not successful on that. Why don't we give Mr. O'Meara up and we'll get you back on rebuttal. Thank you. Good morning, Your Honors. Daniel P. O'Meara with Montcarno Crack and Walker & Rhodes here for Fresco Appellee. May it please the Court, In reviewing this order, I want to note how amazingly narrow it is, which is already referenced in the discussion. The problem that we're having, or at least some of us are having, is that you have four factors to consider, same factors that you have for a state pending appeal that was dealt with in Revel. You have to deal with all four. You can't deal with just one. And as important as irreparable harm is, success on the merits is perhaps equally important. But those two are probably the most important of the four. But you've got to deal with them. And it doesn't look from this addendum or footnote to the order that factors one, three, and four were dealt with at all. I respectfully disagree, Your Honor. But where in there is there... Sure. In the footnote one, it's not labeled as discussion of success on the merits, but there's a very extensive discussion of the trade secret evidence, the trade secret arguments, and the trade secrets conclusions. I'll read off. And so Dooling-Hawkins will likely use a specialized and confidential knowledge... Are you on page three or four? I'm sorry, I'm on page four. Page four, and where on page four? In the first full paragraph... Fresco asserts? Yes. Okay. In the fifth line down... And so Dooling, okay. Hawkins will likely use a specialized and confidential knowledge to the detriment of Fresco. Going down to that bottom paragraph, in the present case, Fresco has likely suffered irreparable harm in the absence of the narrow junction provided. Well, that's irreparable harm. Okay. Because Hawkins has knowledge of Fresco's trade secrets, including, among other things, Fresco's future business plans and marketing strategies, because Hawkins will be tasked with soliciting, contacting, and communicating with Fresco's coffee packaging clients. Therefore, it is likely that the disclosure and or use of Fresco's trade secrets will occur. Two of our claims under the Pennsylvania Uniform Trade Secrets Act and the newly enacted Federal Defend Trade Seat, DTSA, in any event. And there's other discussion within her decision about... Does the court deal at all with the Rodell decision, whether it be an alternative ruling or merely dicta, but in any way? No, she doesn't discuss it in any way. I'll be glad to discuss it here. I don't know if her not addressing it was an act of diplomacy from one judge to another. What about the possibility of harm to Hawkins if the TRO or preliminary injunction is entered? The balance in the interest? Again, she said that she had to consider that to the issue of the injunction. She issued the injunction. I understand. I'd like to think it's implied, even if not expressly discussed. It's tough for me to imply a lot of things, Pierre. I have a record, and the record here is essentially two pages of single-spaced explanation. And I can't... I mean, probably you're right that when it goes back, the court will say that there is a substantial likelihood of success on the merits for your side. Probably. But that doesn't get you over the hurdle. And the comeback that Mr. Cass is going to say, yeah, well, if that's really true, Ambrose, how come Bedell wasn't dealt with? And we're not afraid of a remand. But, again, I've requested that the decision be affirmed. And even with respect to the balancing of the interest, which you alluded to, sure, she doesn't discuss it other than to say it's something she must consider. But the evidence that was before her, okay, she balanced the interest. If Hawkins is enjoined, he can work there. He can solicit clients. He can solicit clients of Fresco, just not his top 12. If Transcontinental is enjoined, as they were, they can employ him. They can use anyone they want to solicit any Fresco client, including those 12, just not Hawkins. Amazingly narrow relief. If before the court was evidence that if... What evidence? The evidence was two affidavits? Yes. That's a very thin record. It's a thin record, but it's a narrow injunction. And this case does lead to the question of how much discretion does a district court judge have? Does there have to be a testimonial hearing in every preliminary injunction case? Or if there's sufficient written submissions sworn subject to appellate perjury and especially narrow order sought, can the judge issue an order on the day before he starts working? There was no statement among counsel that this would be the record for the preliminary injunction decision? There was no such discussion among us. And frankly, reading the order, although Mr. Cass complains it's been in effect for five months, that's largely his election. The order says it's good until further order of the court. He could have, and frankly I would have, if I were him, moved for a hearing, moved to modify, moved to dissolve. He chose not to do any of that. He could have done even one of the cases on appeal, and he instead appealed to this court, which, by the way, the fact that they're only so narrowly enjoined and they nonetheless make a Third Circuit case out of it, I think, raises but also answers the question of whether Mr. Hawkins is in fact going to solicit those five. When you look at the factors, let's just go to the fourth factor, public interest. Could not one make an argument that the ruling or dicta in Bodell was, in effect, a statement of public interest that certain types of non-compete agreements are unenforceable? Yes, one could make that argument, and Mr. Cass did make that argument unsuccessfully. Well, he made the argument and it wasn't addressed. Correct. The lack of success was, frankly, but the injunction issued notwithstanding his argument. And again, this may raise the issue of whether a district court in addressing an injunction needs to address each and every argument. I've been on the losing side, and my arguments weren't addressed, and I didn't necessarily see this as a reversible error, but that's not for me to decide here. In any event, with respect to Bodell, he seems to claim that he's a forgery. One argument he makes is that stare decisis, that one district court judge is essentially bound by the second district court. The second is bound by the first. There's no eastern district rule that would suggest that in any way. I said in a Supreme Court case, it says that's not the case in any way. His backup is to say collateral stop. I should note that not only was there this Bodell decision issued 13 years ago, there's a Faust decision issued 11 years ago by Bucks County President Court Judge Heckler where he specifically disagreed with Judge Dalzell. I thought Bodell was 2005. I thought like November or so of 2005. I have it as 2004, but I could be wrong in that regard. Clearly, Faust was subsequent because I argued that latter case Faust, as did Mr. Cass' law firm, they were involved, and they argued based on the Bodell case, and President Judge Heckler said, I disagree with Judge Dalzell. I find this agreement can be enforceable. I don't think that decision is binding on Judge Tucker. All the same arguments can be made. This case wasn't for Judge Dalzell or Judge Heckler to decide. It was for Judge Tucker to decide and not for this panel to decide. And there are significant differences with respect to collateral estoppel, different issues. These are different defendants put to work in different ways, different facts, slightly different agreements. As was noted, the consideration was a key factor in the Bodell decision. Those facts are not here. This agreement was clearly supported by consideration. And frankly, the Pennsylvania courts look in determining reasonableness to the relief sought by the plaintiff as they enter the courtroom. The relief sought here is dramatically different. And finally, Judge Dalzell thought it was important that Bodell had come to Fresco from a competitor of Fresco's, that he had knowledge of the industry outside Fresco and of relationships. That's not the case here. Mr. Hawkins came from outside the industry, didn't know anyone or anything. He had to be trained from the beginning. Should I address the bond issue? I thought that was dealt with. It's resolved. And as a public interest, I think implied within the judge's ruling, is that there's no public interest in misappropriating trade secrets or violating contracts, especially in such a way that's going to cause the layoff of 20 to 30 innocent hourly employees if this dollar volume is lost. Frankly, with respect to irreparable harm, I would like to address that. We put on extensive evidence of irreparable harm. Appellant now says that was inadequate and also says it wasn't sufficiently imminent irreparable harm. But as noted by the judge, it's very difficult to predict sales from a given customer, let alone profits from that customer, especially when we're talking about an average of a million dollars or more sales per year. To do so, sales or profits from a group of customers, equally difficult or more so. As they say, we don't know when the phone doesn't ring. And further complicating any damages analysis, Transcontinental says it already sells to three of those 12 customers. So then damage analysis, if Hawkins were soliciting, it would be unclear what was caused by Hawkins solicitation versus other business factors. So there was substantial evidence of irreparable harm. Indeed, the Pennsylvania Uniform Trade Secret Act says with respect to irreparable harm, actual or threatened misappropriation may be enjoined. They don't have to wait until it starts. The Defend Trade Secrets Act says the court may grant an injunction to prevent any actual or threatened misappropriation. Point of fact, this injunction was issued on Friday, August 26th. As noted in the decision, Hawkins was set to start the following Monday. Monday, August 29th, I believe it was. So the next business day... What was the argument you made to the district court with regard to success on the merits? Pardon me? What was the argument you made to the district court with regard to success on the merits? It was a two-fold argument based on both the agreement and on the trade secrets argument. With respect to the agreement, he signed it. It clearly prohibits his solicitation of customers. It was clearly supported by consideration. It met all the other standards. We disagree with opposing counsel about whether it's reasonable. But the point of that fact is we were only looking for 12 customers, which I think shaped the analysis there, as it should and must. What was the nature of the trade secrets? The nature of the trade secrets was customer information, broadly defined, and product information. The customer information was well known, so that's not an issue. Who the customers are at the institutions is one thing, but there's extensive trade secrets even if that's known. Who actually controls the purchasing decision within the company? It may be different for services, which are purchased from Fresco, for materials, the packaging materials you buy the coffee in, or for the major equipment purchases. It's often someone different. Often the person who controls it is above the buyer, but they don't want their identity as the decision maker to be known for their own time management reasons. There's extensive information about customer needs, future production plans of the customers, if they have an initiative to go green and have their little teacups be biodegradable. That's very significant secret information, especially if they want to do it in a certain way. And I'm not sure Mr. Hopkins denies that there's trade secrets in the business, or transcontinental, because I think they've got their own agreements that say their information is trade secrets. Should I further address the trade secrets issue? Because there's product information too. The products, what we're talking about here, if you own a Starbucks and buy a bag of coffee to go, it's got this flexible package. In fact, they call this business flexible packaging. There's a surprising amount of technology that goes into that product. Make it shiny and flexible so you want to buy it, but it won't break. And you have layers of polyurethane, sealant, polypropylene. I don't understand it all, but the way a product is made is maintaining great secrecy by the organization. And the salespeople come to know how their customers' products are made, even if the customer doesn't know themselves. Thank you very much. Mr. Cass. I just want to address a couple of those points. First, Mr. McRae keeps on saying that this is an unbelievably narrow injunction. It's not narrow at all. The injunction, even though it only covers 12 companies, those are the 12 companies that Mr. Hopkins has spent almost all of his time on. Three of those companies are already customers of Transcontinental Ultraflex. One of those companies, Transcontinental Ultraflex, does more than 90% of that company's packaging. Transcontinental does not have another West Coast salesperson. So what's happening during this last five months is that a higher-level person, a VP based in New York, has to keep on flying to the West Coast in order to service these clients because Mr. Hopkins is enjoying from dealing with them. There is no law that says that just because someone is a salesperson for a company for a certain number of years that they're not allowed to go and work for a competitor. The only thing that would stop them would be a valid non-competition agreement. And that's the big question here of whether there is a valid, enforceable non-competition agreement. Did you make a request for an evidentiary hearing? That was already my question. We did not make a request for an evidentiary hearing because we, quite frankly, when we saw that the judge was going to rule based upon what was before her, we assumed that either there was going to be a very short-term TRO and then we'd have a schedule for a preliminary injunction. I thought it was a TRO hearing more than a preliminary injunction hearing, or that the judge was going to rule in our favor. We thought that there was sufficient evidence on the record for the judge to make a correct ruling. There was not sufficient evidence, though, for the judge to issue a preliminary injunction hearing with no time limit and no evidentiary hearing. So if you had this to do all over again, would you have appealed or would you have just gone straight to a merits hearing? Well, the judge actually just this past Friday, the judge has taken the position that she's powerless to do anything while this appeal was going on. I'm asking you what you would have done if you had to do this all over again. It was August and it moved very quickly. It's now January, so that's quick for an appeal. But you're saying, look, every day is a lost day. Wouldn't it be better to have, in hindsight, and I realize hindsight is 20-20, to have just gone straight to some type of merits full hearing and go from there? Well, we couldn't do that, Your Honor, because the judge just a couple of weeks after the injunction was put into place, the judge scheduled an arbitration, court-ordered arbitration in this case, that was scheduled for January the 12th. We all assembled for that just last week. And then when we all assembled for that, Mr. Hawkins came from San Diego. Then Fresco took the position that the arbitration panel had no jurisdiction. Judge Tucker was consulted. She said she wanted to think about it. Then we asked for an evidentiary hearing without arbitration, and she said that she believes that she has no power to do that. What you're asking us to do at this point is just rule quickly. That would certainly be appreciated, Your Honor. All right. And if I might just make one more point, there's been reference to the two statutes, the Pennsylvania statute and the federal statute. Those statutes really don't come into play at all unless the contract is an enforceable contract, because those contracts depend upon misappropriation. The term misappropriation is defined as not just a salesperson going and being in the same business for a competitor. It's defined as breaking a contract or doing some other wrongful activity that has an independent source of law that says that it should not be permitted. Is there some tension in the language between the federal and the state contract? No. Actually, the federal and the state statutes use just about the same language with regard to misappropriation. It's just that the federal statute also has a provision saying that there can be no injunction in violation of state law. And here, of course, at least in our view, we do have Judge Dozell's opinion, which states what the state law is in this respect. Thank you very much. Thank you both, counsel. I appreciate your being here today. We'll take the matter under advisement and recess.